### TEAGUE *v*. HUTTO.

### Opinion delivered January 28, 1918.

REAL ESTATE BROKERS—SECRET COMMISSION.—One S. undertook to act for appellant in the purchase of certain land, and secured H. to assist in closing the sale. Without the knowledge of appellant, a commission was paid H. for his services. *Held*, under the evidence that appellant was not entitled to recover from S. and H. for a secret commission collected by them, and that the evidence failed to show a secret understanding between H. and S. to induce appellant to make the purchase, in order that they might share in the commission.

Appeal from Lonoke Chancery Court; *John E. Martineau*, Chancellor; affirmed.

*Morris & Morris* and *C. A. Walls*, for appellant.

1. Appellees were both guilty of fraud. 71 Ark. 277.

2. Scroggin was the agent of Hutto and of appellant, a double agent, and his acts are binding upon both. 31 Cyc. 1458; 71 Ark. 277; 2 Pom. Eq. Jur. 884, 959; 31 Cyc. 1244; 1 Parsons Cont. (5 ed.) 73.

3. Hutto was appellants' agent and he is estopped from disclaiming his agency. 31 Cyc. 1244; 21 L. R. A. 55; 90 Ark. 301; 17 N. J. Eq. 554.

4.   The $750 which Scroggin received was not a gift but was simply carrying out a prior agreement and was paid by way of settlement or compromise.   90 Ark. 301.

5.   Appellant was not guilty of any agreement to defraud a third person of a commission; he comes into equity with clean hands.

6.   The value of the land does not enter into the merits of the case, appellees are liable for the secret commission.   71 Ark. 277.

*James B. Gray,* for appellees.

1.   The findings of the chancellor will not be disturbed.   57 Ark. Law. Rep. 180; Jones on Ev. (2 ed.) 14-15; 47 Ark. 148; 8 Peters 244; 82 Ill. 589.

2.   71 Ark. 277 is not applicable here.   There was neither fraud nor overreaching and no secret agreement. The commission was legitimately earned and all the dealings were fair and in good faith.   12 Cush. 27.

### STATEMENT OF FACTS.

F. L. Teague instituted this action in the chancery court against Freed Hutto and D. H. Scroggin to compel them to account to him for a secret commission which he alleges they received from the other party while acting for him in the purchase of a certain tract of land in Lonoke County, Arkansas.

The allegations of the complaint were denied and the answer averred that no relation of trust or agency existed between Teague and Hutto and Scroggin.

F. L. Teague testified that he was a farmer and a customer and a close friend of D. H. Scroggin; that prior to this deal he had implicit confidence in Scroggin; that some time in January Mr. Scroggin got after him to buy the England place on Plum Bayou, as he wanted him for a neighbor, that he had land adjoining this place; Scroggin did not know the price for which this land could be bought, he thought it was either $23,500 or $28,500; but that he would see England for him when he returned; that he requested Mr. Scroggin to do this, as Mr. Scrog-

gin had already been figuring with him on the place; that when England came, he went to see Mr. Scroggin and told him that Mr. England had come, for him to get a price from England; that this was on the 20th day of January, 1917; that Scroggin was supposed to have gone to see Mr. England, for he came back and told him that England wanted $28,500 for the place, $10,000 down; but after talking with Mr. England awhile, Mr. England agreed to take for the place $26,500 cash, and that the deal would have to be closed by 4:30 or 5 o'clock; that he requested Scroggin to call Mr. England over the phone and get an extension of time; but England refused to grant further time; that he finally agreed to take the place for $26,500 and Mr. Scroggin called England and told him so; that, on the way up to Mr. England's Scroggin told him that Mr. England would rather make the deed to some third party and Scroggin suggested Hutto; Scroggin said that Hutto would fix up the papers and pass on the abstract and he would not charge anything for it; that Scroggin told him England had offered him, Scroggin, a commission out of the deal, but Scroggin said, "I do not want a cent out of it, you are too good a friend to me." Scroggin told him that Hutto wasn't to be paid anything out of the deal, maybe England would pay him one hundred dollars; that they entered into a contract, after reaching England's, wherein England agreed to convey the land to Freed Hutto for $26,500.

That on Monday following the 31st, appellant learned from George Geolzier and Jim Lawhorn that they had had the same land bought for $24,000 on the 20th day of January, the same day that he had bought it; that after learning this, appellant went to Scroggin and told him that he had been done wrong in this deal, but Scroggin assured him that he was mistaken, and told him that Geolzier and Lawhorn were trying to make him sick of his deal; that Scroggin further said Hutto knew nothing about the deal until Mr. England went to his house for him to sign the contract and again said that Hutto was

not getting a penny out of it; after being reassured by Mr. Scroggin, appellant was satisfied that the deal was straight; that prior to going to Mr. Scroggin to ascertain whether he had been treated wrong in this deal, he went to Mr. England and asked him, and that Mr. England told him that neither Hutto nor Scroggin got any commission or profit out of the deal; that some days later, appellant went to Hutto and asked him if he got a commission out of the sale of this land, and Hutto told me that he did get a commission but would not say how much; that, after learning from Mr. Hutto that he obtained a commission, he told Scroggin about it; that Scroggin said that he was glad that appellant had told him, for, if Hutto got anything out of it, he was entitled to part of it, as Hutto had nothing to do with the deal and knew nothing about the deal until England carried him the contract for him to sign; that he saw Scroggin on the 20th, and the deal was closed in the afternoon about 4 o'clock; that he was not familiar with transactions of this kind and depended solely on Mr. Scroggin to take care of him; that appellant never authorized Scroggin to retain Hutto to assist in closing up this deal; that Hutto had never talked with him either prior to or at the time of this deal about selling him this tract of land; that he did not know why the deed was made to Hutto and not direct to him; that England had never refused to convey the land to him; that Scroggin said Mr. England had rather convey it to Hutto; that he did not ask why it was necessary to make the deed to Mr. Hutto because he was depending on Mr. Scroggin and that Scroggin suggested that the deed be made to Hutto; that appellant did not know, until about ten days after the deeds and money had passed that Hutto or Scroggin had received a secret commission out of the deal; had never asked Hutto whether he was getting a commission until ten days after the money and deeds had passed but had believed Scroggin when he told him that Hutto was not getting a commission; never saw Hutto on the day of con-

tract for the place; never employed Hutto; did not know that Jim Lawhorn and George Geolzier had been trying to buy the place; nor that they had ever talked with Mr. England about purchasing the place, until told by them after his trade was closed.

The testimony of J. R. England is substantially as follows: During the year 1914, the land in controversy was listed with Freed Hutto for sale by J. R. England representing John C. England's estate. During the fall of 1916, F. L. Teague sold his plantation and contemplated purchasing another one. D. H. Scroggin was a merchant with whom Teague traded and the latter spoke to the former about buying another place. Freed Hutto was a real estate agent, and J. R. England had charge of the lands belonging to the estate of John C. England, deceased. All the parties lived at England, Arkansas, and were well acquainted with each other. The land in controversy was situated near England. Hutto told Scroggin that he intended to sell Teague a part of the Nelson & Hoyt lands that he had for sale. Scroggin replied that he did not think these lands would be suitable for Teague and that he wanted Teague to buy the England land, referring to the tract of land in controversy. This conversation occurred in the fall of 1916, but Hutto did not mention to Teague the purchase of the England place at that time. In the early part of January, 1917, England went to St. Louis, Missouri, on business and returned to England on the morning of the 20th inst. When England went home to lunch, he was informed by his wife that some one had called up and requested that he go by and see Hutto. England went to see Hutto immediately after lunch and found him sick in bed. Hutto had been sick for several days. Hutto asked England what was the least cash price he would take for the land. The former price he had listed the land for with Hutto was partly for cash and partly on a credit. England asked Hutto to whom he was going to sell the land. Hutto laughingly replied that it did not make any difference

and said: "If I get the money in the bank this afternoon, what will you take for the land?" England responded that he would take $25,000 cash net to him, if the deal was closed by 4 or 5 o'clock on the same afternoon. Hutto accepted his proposition. Hutto then asked England to call up Scroggin to whom he supposed Hutto was selling the land. Scroggin came over and upon being told the price of the land tried to induce England to reduce the price; but the latter refused. England and Scroggin then left Hutto's house and went down town. Later Scroggin called up England and asked him to wait until the next Monday so that further time might be had for examining the land. This was Saturday. England refused the extension of time and later in the afternoon Scroggin and Teague came to the office of England to close the transaction. England objected to making a deed to Teague on the ground that Jas. Lawhorn, an intimate friend had already mentioned Teague to him as a prospective purchaser and he was afraid that Lawhorn would think he had not been treated right and would want a commission if the deed was made to Teague. England then went to the home of Hutto and entered into a contract with him for the sale of the land for $26,500. The deed was executed the same day and immediately Hutto executed a deed to Teague and the money was paid to England. A part of the money was borrowed by Teague from the bank of which Hutto was president. As soon as England returned from St. Louis,. he agreed to sell Lawhorn the place for $24,000 net and would have closed the deal with him if Lawhorn had paid the money at any time before noon on the day of the 20th although he was not legally bound to do so. Teague got a cheap place and England sold because of war conditions, realizing that if he sold he would get the John C. England estate in much safer condition.

According to the testimony of Hutto, he talked with Scroggin about the first of January, 1917, in regard to selling some other lands to Teague. Scroggin replied

that he did not think it best for Teague to buy these lands but that he was in the market for a farm and that he thought he would buy the England place. Hutto was sick in bed for several days and had his wife call up England several days before the 20th of January, 1917. On that day his wife again called up England's residence and was told that England would come over immediately after lunch. Hutto had two parties in view as prospective purchasers of the land, viz: Teague and R. N. Oates of Russellville, Arkansas. After England refused to give him a longer time than that day, he abandoned the idea of negotiating with Oates because the latter could not reach England that day and examine the land. Hutto wanted England to make a deed direct to Teague and thought that the difference between $25,000, the price he agreed to pay England, and $26,500, the price Teague paid, would be his commissions. The deed was made to him and by him to Teague at the suggestion of England, who thought he might have to pay another commission to Lawhorn if he made the deed direct to Teague. About thirty days after the sale Oates came to England and examined the land. He then offered Teague $30,000 cash for the place and Teague refused the offer. The price paid by Teague was very reasonable and the land was really worth more than Teague paid for it. Hutto denied that he was agent for Teague or that he entered into any conspiracy with Scroggin to make a secret profit out of Teague. He did not tell Teague the commission he was to make in the sale because that was not usually done. Such act tended to hinder a sale because the purchaser would want to have the commission reduced before he would complete the sale. There was no understanding between Hutto and Scroggin whereby the latter was to receive any of the commission. Hutto does not think that Scroggin would ever have known that he received any commission out of the transaction if he had not told Teague that he did receive a commission, and Teague then told Scroggin. In a day or two after the sale, Teague

came to Hutto and expressed dissatisfaction about it, said that he had not been treated right and especially by Scroggin. Hutto told Teague that he had not treated him wrong but had just sold the place like any other real estate and had made a commission out of it. Scroggin soon after this conversation between Hutto and Teague came to Hutto and told him that if he had been paid a commission he ought to have half of it. Hutto told him he had made a commission of $1,500. Scroggin insisted that Hutto should pay him half of the commission and Hutto finally did so.

The testimony of D. H. Scroggin was, briefly stated, as follows: Mr. Teague was one of my customers and I have known him about twelve years. About the first of January, 1917, Teague was about my store a good deal as he had nothing to do. He said that he wished he knew where he could buy a good piece of land and asked me if I knew of any for sale. I told him that I did not know of any that he could buy for a reasonable price. After that we talked about several, tracts of land. In a few days I happened to think that England had offered to sell me the England place and I told Teague about it. In a few days after that it snowed and I went hunting. In doing so I passed over the England farm. Teague was in the store when I returned that evening and I told him about it. He replied that if he had known about it, he would have gone with me. I told him that I could not see the land because it was covered with snow, but that from the cotton stalks it must be very fine land. I did not think anything more about it until a few days thereafter when Hutto told me he was going to try to sell the Nelson & Hoyt lands to Teague. I told Hutto that I did not think it advisable to sell Teague those lands; for at his age by the time he got the land cleared he would be too old to look after it; that I was only acting as a friend to Teague but that when he got the lands cleared he would kill himself working it. At that time I mentioned to Hutto that I was going to try to get Teague to buy the

England place. Later I talked to Teague about the place but had forgotten having spoken to Hutto about it. Teague asked me to see England about it and I told him England was in St. Louis. I told him he had better see England himself. But I told him to watch out for Mr. England when he came home and I would see him. I was disinterested and did not want to make anything out of it. On the 20th of January, 1917, I met Teague on the street and he told me that England was home and that if I was going to do anything about the matter, I had better see England. I called up England's residence and several other places trying to find him, but failed to do so. About that time I was asked over the phone to come to Hutto's. He was sick and I had been to his house several different days to see him while he was sick. I thought that he might be worse and went to his house and found England there. I asked Hutto how he was and did not know that I had been called there about the trade. After we had talked a little while about Hutto's condition, I told him that I wanted to see him about the purchase of the England place by Mr. Teague. Hutto said: ''You can make a price on that place of $26,500.'' I replied that I did not know whether Teague would buy it or not , but said that I would go back and tell him. I told Teague that England wanted $26,500 for the place. He replied: ''Well, Scroggin, I do not know what about it, this buying a great big thing and not looking at it.'' I agreed with him and he asked me what I thought about it. I said: ''I am not going to advise you Mr. Teague. Now don't buy this place on my say so, Mr. Teague, for it is too big a thing and I could not say. I finally looked at my watch and told him that I had told Mr. England I would call him up about it. He said, 'Well call him up and tell him I will take it.' We went to Mr. England's office and I said: 'Well now I put you gentlemen together, close this trade.' '' Mr. Teague said he would take the place at $26,500 and Mr. England said to him: ''I can't sell you this place but will sell it to Hutto and in

turn he can sell it to you.'' One of us asked why and he said he wanted to avoid two commissions. That was the first I had thought of a commission. They wrote up a contract of sale and Teague signed it. England then took the contract to Hutto's for him to sign and agreed to then meet us at the bank. England made a deed to Hutto and then Hutto made a deed to Teague to the land. In a few days Teague came into my store and asked me if I knew that Hutto had gotten a commission out of the trade. I told him that I did not but that if he did I was going to see him about it and demand half of it. I told Teague I would let him know about it. I saw Hutto and claimed half of the commission. He at first laughed and jollied me but finally told me he had received $1,500 and agreed to pay me half of it, which he did. In the meantime, I had learned that Teague was mad at me about the matter. I acted as a friend to Teague in the matter and tried to save him money. I did not know that Hutto was going to get a commission out of the transaction and did not expect any myself. I did not know that Hutto was interested in the matter until I called at his house on the day the trade was made and found England was there. When I found out from Teague after the sale, that Hutto was getting a commission, it was then I thought for the first time about a commission and claiming half of it. Prior to that time there had been no understanding between Hutto and myself about a commission. Other testimony will be stated or referred to in the opinion.

The chancellor found in favor of the defendants and a decree accordingly was entered of record. The plaintiff has appealed.

HART, J., (after stating the facts). It is claimed by counsel for the plaintiff that a breach of duty and obligation created by the relation of confidence between principal and agent is involved in this lawsuit and that Hutto and Scroggin acquired secret profits, during the existence of that relationship and that they should be held as trustees and compelled to account therefor to Teague,

their principal. It is the theory of the plaintiff that
Scroggin was the agent of Teague for the purchase of
the lands in question and that Hutto became aware of this
fact, and entered into a conspiracy with him to secure
a secret profit for themselves in the transaction based
upon the trust and confidence which Teague placed in
Scroggin. They rely upon the case of *Tegarden* v. *Big
Star Zinc Co.*, 71 Ark. 277, and contend that the facts
of the present case bring it within the principles of law
laid down in that case.

Counsel for the defendants while admitting the cor-
rectness of the principles of law decided in that case
and its application to the facts there presented by the
record, insist that the holding of the chancellor was cor-
rect under the facts disclosed by the record in the pres-
ent case. In this claim we think counsel are correct. It
will be appropriate here to examine the case relied upon
for a reversal of the decree by counsel for the plain-
tiff and compare the facts of that case with those shown
by the record in the present case. There, Bordeen au-
thorized the Tegarden Bros. to sell certain mineral lands
for him. They in turn agreed with McFarland that if
he would assist them in selling the lands they would di-
vide the commissions to be received by them for selling
the lands. McFarland organized the Big Star Zinc Com-
pany for the purpose of buying the lands. He became
a member of it. The completion of the organization was
delayed and during its progress, the lands were con-
veyed to McFarland for a much less sum than it was in-
tended that the Zinc Company should pay for them.
McFarland represented to each member of the corpora-
tion during the progress of its formation that the lands
could not be purchased for less than $5,000, a sum greatly
in excess of what Bordeen asked and received for them.
The corporation purchased the lands at this price. The
Tegardens knew the representations made to the mem-
bers by McFarland and sanctioned his course and con-
duct in the matter. The court held that under these cir-

cumstances McFarland could not make a secret profit out of the sale of the land, and the Tegardens being parties to what he did, occupied the same position he did because he had acted in the matter with their knowledge and approval.

In the present case the record does not show that Hutto had any knowledge that Scroggin was acting as the agent of Teague. He only supposed that Scroggin was the friend of Teague and for that reason Teague consulted him. He intended that the deed should be made direct to Teague. England suggested otherwise for reasons of his own which are entirely disconnected with the theory that he was endeavoring to assist Hutto and Scroggin in making a secret commission out of the sale. The fact that Hutto did not state the amount of the commission to be received by him is not to be taken against him; for obviously such a course would tend to hinder the sale. It is claimed that the fact that the check by Hutto to Scroggin was dated on the day of the sale, that this contradicts their testimony to the effect that it was done a few days after the sale, and was not thought of until it was done. It is true the check was dated the day of the sale but it was not presented for payment until the second day of February. This tends to corroborate the testimony of Hutto and Scroggin rather than contradict it. The check was doubtless presented for payment at the bank as soon as it was given, but was dated back as of the date of the original transaction. The check for the purchase money was collected at once and it is likely this check would have been presented at once too and the whole matter closed up. We have not attempted to enter into a detailed discussion of the evidence, but both Hutto and Scroggin testify in positive terms that there was no agreement of any kind between themselves for a commission in the sale. Their testimony is corroborated by England. He had no interest in the matter. It was generally known that he wished to sell the place. The negotiations between him and

Hutto were free from suspicious circumstances. Under all the facts and circumstances, the chancellor was correct in holding that the testimony was insufficient to show that Hutto knew that Scroggin was the agent of Teague for the purchase of the lands and conspired with him to induce Teague to purchase the lands in order that they might make a secret profit out of the transaction.

This brings us to a consideration of whether or not Scroggin was the agent of Teague for the purchase of the lands. The testimony on this point is in direct conflict. According to the testimony of Teague, Scroggin was his agent. Scroggin denied the agency and testified that he only acted as the friend of Teague in the matter because he thought it to be a good investment. He said he was entirely disinterested and only advised with Teague about it as a friend. The investment turned out to be a good one. Scroggin says he was only interested as a friend of Teague in seeing that he did not make a bad bargain. That he had no thought of a commission in the matter until several days after the trade was made, and then concluded that if Hutto had received a commission, he should have half of it. His demand for this was not, according to his testimony, the result of any agreement or understanding, direct or implied, before the sale. His testimony is in some respects corroborated by that of Hutto and England. The burden of proof was upon Teague to establish the allegations of his complaint by a preponderance of the evidence. The chancellor found that he had not done so.

It is the settled rule of this court that the finding of facts made by a chancellor will not be disturbed on appeal unless they are against the preponderance of the evidence. Therefore, the decree will be affirmed.